# UNITED STATES DISTRICT COURT
# DISTRICT OF THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Hon. Christopher R. Cooper** |
| **Plaintiff,** | : | |
| | : | **CRIMINAL NO. 17-cr-215** |
| | : | |
| **vs.** | : | |
| | : | |
| **RODERICK BENNETT,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## HEARING BRIEF OF THE UNITED STATES AND INCORPORATED MEMORANDUM OF LAW

The United States of America, by David Jaffe, Chief, Organized Crime and Gang Section, and Trial Attorneys Vincent J. Falvo, Jr. and Julie A. Finocchiaro, respectfully submits this hearing brief and incorporated memorandum of law to assist the Court at hearing.   The hearing of this matter is scheduled to begin on December 17, 2018.

## Table of Contents

I. Summary of the Government's Case ........................................... 2

    A. Background on LIUNA and its Credit Card Program ........... 2

    B. Defendant BENNETT Abuses LIUNA-Issued AMEX Credit Card with Hundreds of Unauthorized Personal Purchases ........... 4

II. Thefts from LIUNA, a Labor Organization (29 U.S.C. § 501(c)) ........... 7

    A. Applicable Principles ........................................... 7

1

**B. Charges in Counts One through Three of the Indictment**    **10**

**III. Evidentiary Presentation**    **11**

    **A. Witnesses Who Will Be Called**    **11**

    **B. Witnesses Who May Be Called if Necessary**    **12**

    **C. Overview of Exhibits**    **14**

    **D. Count One: Travel and Entertainment**    **15**

    **E. Count Two: Household Goods and Services**    **21**

    **F. Count Three: Clothing, Jewelry, and Personal Items**    **32**

## I. Summary of the Government's Case

At the hearing, the Government will produce documentary and testimonial evidence on the following matters:

### A. Background on LIUNA and its Credit Card Program

Laborers International Union of North America (LIUNA) represents laborers in the construction industry.  LIUNA is governed by a constitution and by-laws (Gov't Exhibit 1).  LIUNA has adopted a "Code of Best Practices" binding on all LIUNA officers, employees, and members that specifies, in part, that, "Union officials and representatives shall insure that Union assets and resources are expended only for proper purposes and never for personal gain or advantage."  (Gov't Exhibit 3).

Defendant BENNETT served as Chief of Staff to the General President of LIUNA for four years, ending in Defendant BENNETT's dismissal in October 2016

(Gov't Exhibit 2-4, 43).

LIUNA provides AMEX credit cards for its headquarters employees who incur business expenses.   LIUNA issues the cards for business purchases only and not to be used for personal purchases.   The monthly bills of those officials carrying AMEX cards are paid automatically by LIUNA.   (Gov't Exhibit 4-5).

In the rare instances when cardholders do make personal purchases, LIUNA obligates them to identify the expenditures on the account statement and reimburse LIUNA within a month.   All holders of the AMEX credit cards are required by express rule to prepare a "Monthly Report of Business Expenses" and file it with the LIUNA Accounting Department along with the original receipts.   The procedure is thus:

1)   The Accounting Department receives the cumulative monthly bill for all cardholders and pays the total amount charged by all cardholders;

2)   The Accounting Department delivers to each cardholder his or her portion of the monthly AMEX bill which it has already paid;

3)   The cardholder compiles his or her Monthly Report, along with the required vouchers and original receipts; and

4)   The cardholder returns his or her Monthly Report, along with reimbursement to LIUNA for payment for any personal charges made on the card. (Gov't Exhibit 4-5, 6-39).

LIUNA's instructions for the Monthly Report require that the cardholder submit

3

the report "promptly on a monthly basis" and directs that cardholders must obtain an original receipt for "all expenditures for which a receipt can be obtained."   In addition, the instructions direct the cardholders to submit an activity report, "which details the business activities for days on which reimbursable or chargeable expenses were incurred by traveling."   (Gov't Exhibits 4-5).

As Chief of Staff, Defendant BENNETT was the head of the human resources function at LIUNA headquarters and the final arbiter on any disputed charges on the AMEX card, including his own, short of involving the General President or Secretary-Treasurer.

### B. Defendant BENNETT Abuses LIUNA-Issued Credit Card with Hundreds of Unauthorized Personal Purchases

Defendant BENNETT carried an AMEX credit card during his period as Chief of Staff.   Unlike all of the other cardholders, Defendant BENNETT made numerous personal charges of his AMEX card every month, and the Accounting Department continually invoiced Defendant BENNETT to repay LIUNA for personal purchases. Despite those constant reminders, Defendant BENNETT frequently carried a substantial running debt to LIUNA from month to month (Gov't Exhibits 6-39, 41-42).

Defendant BENNETT and his personal secretary composed and filed his Monthly Reports.   His secretary filled out vouchers on Defendant BENNETT's behalf

4

when she received the AMEX bill from the Accounting Department.   The secretary then provided the vouchers to Defendant BENNETT who would then spell out the business purpose for the expense and provide the underlying receipt (Gov't Exhibits 6-39).   Despite this system, Defendant BENNETT compiled a horrendous record of not filing Monthly Reports on time or submitting the required receipts with his reports and vouchers.   Where the other cardholders might have a handful of missing receipts, Defendant BENNETT often failed to submit dozens per month and, at times, had over 100 missing receipts at any time—some delinquent more than one year (Gov't Exhibits 40a-d).

The instructions for the Monthly Report also provide that reimbursement for meals at the home office will be made "if a detailed listing of what business was being discussed is included and it is not a regular occurrence."   In his tenure as Chief of Staff, Defendant BENNETT was a prodigious purchaser of food, lodging, and liquor on his AMEX card.   Defendant BENNETT spent more than $4,000 at more than 14 different restaurants in Washington, D.C., and tens of thousands more at others restaurants, bars, and hotels (Gov't Exhibits 4-5, 201-02).

On October 12, 2016, the staff at LIUNA headquarters discovered that Defendant BENNETT had issued a false letter of employment to Aimee Occhetti and the General President decided to ask for his resignation.   As part the investigation of the matter, the General President directed the Chief Financial Officer to review

Defendant BENNETT's credit card purchases.  On October 13, 2016, the Chief Financial Officer for LIUNA discovered that Defendant BENNETT had made hundreds of surreptitious and illegitimate personal purchases on his LIUNA-issued AMEX credit card.

Defendant BENNETT failed to submit the receipts for many of those questionable purchases or submitted receipts, but was not able to justify any business purpose for the expense.  Defendant BENNETT also supplied knowingly false reasons to LIUNA for hundreds of personal uses of his AMEX card in an effort to disguise his unauthorized purchases.

On October 14, 2016, LIUNA terminated Defendant BENNETT (Gov't Exhibit 43).  Following his termination, Defendant BENNETT claimed that he had some personal property in a safe that was in his office.  Defendant BENNETT purchased this safe with LIUNA money, and so LIUNA personnel opened the safe and discovered several jewelry pieces inside purchased at Afram Jewelers in Washington, D.C. and Sissy's Log Cabin Jewelry in Jonesboro, Arkansas.  Those items were later confirmed to have been purchased by Defendant BENNETT using his LIUNA-issued AMEX credit card (Gov't Exhibits 44-47, 75, 84).

## II. <u>Thefts from a Labor Organization (29 U.S.C. § 501(c)</u>

### A. <u>Applicable Principles</u>

Section 501(c) of the Labor Management Reporting and Disclosure Act (LMRDA) provides:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

29 U.S.C. § 501(c).  <u>See</u> <u>United States v. Sullivan</u>, 498 F.2d 146, 150 (1st Cir. 1974) (section 501(c) comprises new federal crime whose purpose is "to protect the general union membership from the corruption, however novel, of union officials and employees.").

In order to establish a violation of Section 501(c), four elements must be satisfied:

> 1) the things taken were the monies, funds, securities, property or other assets of a "labor organization" subject to the Labor Management Reporting and Disclosure Act of 1959 (LMRDA) (29 U.S.C. § 402(i));
>
> 2) the Defendant was an officer of, or a person employed by, directly or indirectly, the labor organization;
>
> 3) the Defendant deprived the labor organization of the use of its moneys, funds, securities, property, or other assets; and
>
> 4) the Defendant intended to deprive the organization of the use of its property with knowledge that such use was unauthorized.

United States v. Lawton, 995 F.2d 290, 293 (D.C. Cir. 1993).  See United States v.

DeFries, 129 F.3d 1293, 1306 (D.C. Cir. 1997) ("[A] § 501(c) violation requires the

unauthorized appropriation of union property.") (citing United States v. Stockton, 788

F.2d 210, 217 (4th Cir. 1986)); United States v. Boyle, 482 F.2d 755, 764 (D.C. Cir.

1973) ("Section 501(c) punishes, in this case, an officer who 'abstracts or converts'

union funds to use in a federal political campaign [with] 'knowledge that the act is

unauthorized.'").

Section 501(a) of the LMRDA requires that union property must be held for the

exclusive benefit of the organization and its members and the expenditure of union

funds must be made in accordance with the union's constitution, bylaws, and

appropriate resolutions.  Thus, the significant issue in section 501(c) prosecutions is

whether the taking of the money or assets in question was authorized by the appropriate

governing body of the labor organization.  United States v. DeFries, 129 F.3d 1293,

1307 (D.C. Cir. 1997) ("[W]e agree that a § 501(c) violation requires the unauthorized

appropriation of union property.").

In evaluating authorization, several courts have observed that a formal

authorization that is obtained through fraudulent means does not constitute

authorization for purposes of section 501(c).  That is, if a union official obtains

authorization through false representation or material omission, he cannot rely upon

that apparent approval.  See United States v. Dixon, 609 F.2d 827 (5th Cir. 1980);
United States v. Silverman, 430 F.2d 106, 114 (2d Cir. 1970); Morrissey v. Curran, 482
F.Supp. 31 (S.D.N.Y. 1979) (authorization which is improperly or fraudulently obtained
is also treated as lack of authorization).

The Government may also establish a violation by means of proof that the
expenditure did not legitimately benefit the union and that the Defendant was aware of
that circumstance.  See, for example, United States v. Welch, 728 F.2d 1113, 1119-20
(8th Cir. 1984) (officials' receipt of vacation and severance benefits authorized by
constitution violated 501(c) when officials knew such expenditures would bankrupt
union); United States v. Gibson, 675 F.2d 825, 828 (6th Cir. 1982) (conviction based
on union official's use of union-owned airplane that he was authorized to fly for a trip
whose purpose was primarily personal and not for the benefit of the union).  See also
United States v. Hammond, 201 F.3d 346, 350 (5th Cir. 1999) ("lack of benefit to the
union as a whole coupled with apparent deception regarding the uses to which the
DRIVE funds would be put were sufficient to establish that Hammond fraudulently
intended to deprive the Local of the use of its funds.").

An offense under section 501(c) is completed when the victim-union is deprived
of the use on funds.  "When one sends the union a voucher known to be an improper
one, and then receives payment of the voucher, the crime is completed."  United States
v. Dibrizzi, 393 F.2d 642, 645 (2d Cir. 1968) (citing Morissette v. United States, 342

U.S. 246, 271-73 (1952)).   Accordingly, "the reach of § 501(c) is not limited to union

officers who engage in stealthy larcenies or devious embezzlements."   Id.

> [Section] 501(c) was designed essentially to protect general union
> memberships from the corruption, however novel, of union officials and
> employees.  We do not believe the proscriptions of [section 501(c)] should be
> read to operate solely against those who violate its terms in an active manner.   In
> our view, the willing acceptance of misappropriated union funds by a recipient
> who knows that such funds are unauthorized and illegal will constitute a violation
> of § 501(c).

United States v. Sullivan, 498 F.2d 146, 150 (1st Cir. 1974) (citations omitted) (collecting

cases).

### B. Charges in Counts One through Three of the Indictment

The Government reviewed all of Defendant BENNETT's monthly reports, as

he submitted them to the LIUNA Accounting Department (Gov't Exhibits 6-39), then

compiled each of his purchases into spreadsheets organized in chronological order and

by Payee (Gov't Exhibits 201-02).   The Government then collected all purchases that

appeared personal, for items that LIUNA likely would not buy, and purchases where

Defendant BENNETT failed to file a voucher and/or receipt.   From that group, the

Government identified purchases where Defendant BENNETT presented an

affirmative falsehood to LIUNA in attempting to avoid reimbursing LIUNA for clearly

personal expenditures.

Importantly, the Government did **not** charge Defendant BENNETT with any

expenditures where he indicated to LIUNA, belatedly or otherwise, that the purchase

was personal and offered to reimburse LIUNA, whether or not he eventually did in fact

do so.   Defendant BENNETT often made such an admission by writing "PAY" on

his vouchers or receipts that were submitted to the LIUNA Accounting Department.

(See, for example, Gov't Exhibit 25, pp. 1, 4, 23).

Accordingly, **none** of the expenditures where Defendant BENNETT wrote

"PAY" next to were included in the Indictment, regardless of the circumstances.[1]

### III. Evidentiary Presentation

**A. Witnesses Who Will Be Called**

1.   Charlene McGuire, Chief Financial Officer, LIUNA.

Ms. McGuire will present background information on LIUNA's policies for

credit card use by its executive officers and employees; Defendant BENNETT's record

of non-compliance with those policies; and discovery and investigation of Defendant

BENNETT's unauthorized use of his LIUNA-issued AMEX card.

2.   Labor Department Investigator Anthony Graziano.

Investigator Graziano will present the summary results of his investigation and

the vendor-by-vendor, expense-by-expense, evidence of the unauthorized charges by

Defendant BENNETT contained in the Indictment.

---

[1]   See LIUNA's Accounts Receivable Tally for Defendant BENNETT as of his termination date, October 17, 2016.   (Gov't Exhibit 42).

3.  <u>Kelli Wilson, Secretary, LIUNA</u>.  Defendant BENNETT's secretary will testify concerning Defendant BENNETT's record of non-compliance with LIUNA credit card policies; her assistance in Defendant BENNETT's submission of Monthly Report of his AMEX card use, including identifying handwriting on expense vouchers and receipts; and in-person conflicts Defendant BENNETT had with LIUNA personnel over his credit card abuse.

**B. <u>Witnesses Who May Be Called if Necessary</u>**

4.  <u>Kelly Williams, Supervisor, Accounting Department, LIUNA</u>.

5.  <u>Brian Donahue, International Representative, LIUNA</u>.

6.  <u>Kate Lenn, Controller, LIUNA</u>.

The above witnesses may provide testimony Defendant BENNETT's record of non-compliance with LIUNA credit card policies; in-person conflicts with him over his credit card abuse; and discovery and investigation of Defendant BENNETT's unauthorized use of his LIUNA-issued AMEX card.

7.  <u>Vanessa Griddine-Jones, Executive Director, Congressional Black Caucus Institute (CBCI)</u>.  Ms. Griddine-Jones may be called to provide background concerning the work of the CBCI and its officials; its calendar of events; and its lack of connection to Defendant BENNETT, if charges involving CBCI with the LIUNA-issued AMEX card are contested.

8. <u>Art Collins, Board Member, CBCI</u>.   Mr. Collins may testify concerning the work of the CBCI and its officials; its calendar of events; and his personal lack of connection to Defendant BENNETT, if charges involving CBCI with the LIUNA-issued AMEX card are contested.

9. <u>Girlfriend Number One</u>.   Girlfriend Number One, whose identity is known to defense counsel, may testify concerning her romantic relationship with Defendant BENNETT; Defendant BENNETT's payment of expenses to take Girlfriend Number One to:   1) Las Vegas in April 2014; 2) New York City in May 2014; and 3) various restaurants and hotels in Washington, D.C. during the period from March and May 2014, if BENNETT's payments of those expenses with the LIUNA-issued AMEX card are contested.

10. <u>Caroline Bonardi, Vice-President, The Great Republic</u>.   Ms. Bonardi may testify if Defendant BENNETT's purchases at The Great Republic with the LIUNA-issued AMEX card are contested.

11. <u>Girlfriend Number Two, a LIUNA employee</u>.   This witness, whose identity is known to defense counsel, may testify concerning her romantic relationship with Defendant BENNETT and his presentation of gifts to her, if BENNETT's purchases of those gifts with the LIUNA-issued AMEX card are contested.

### C. **Overview of Exhibits**

Gov't Exhibits 1 and 3 through 5 are governing documents for LIUNA setting forth the duties incumbent upon Defendant BENNETT as a LIUNA employee and rules for use of the LIUNA-issued AMEX card.

Gov't Exhibits 6 through 36 are Defendant BENNETT's Monthly Reports from January 2014 through July 2016, **as he submitted them to the LIUNA Accounting Department**.   Although each monthly report bears a date, Defendant BENNETT did not necessarily submit the particular report on time.   Witnesses called by the Government will testify concerning Defendant BENNETT's persistent difficulties with submitting the monthly reports in a timely fashion and complete with all the required expense vouchers and receipts pursuant to LIUNA policy.

Gov't Exhibits 37 through 39 are Defendant BENNETT's AMEX bills for August through October 2016, respectively.   Defendant BENNETT failed to file any monthly report for August 2016, and he was unable to file for September or October 2016 due to his termination.

Gov't Exhibits 40 through 47 are LIUNA documents pertaining to Defendant BENNETT including reminders from the LIUNA Accounting Department missing receipts; a record of Defendant BENNETT's accounts payable to LIUNA as of his termination; his termination notice; and documents and merchandise recovered from his office.

Gov't Exhibits 48 through 85 are vendor-by-vendor documentation of the unauthorized charges by Defendant BENNETT alleged in the Indictment as compiled by Investigator Anthony Graziano.  Each document follows a specific format:  first the particular charge(s) on the AMEX bill, followed by any expense vouchers and/or receipts submitted by Defendant BENNETT.  In numerous instances, additional documentation retrieved by the Government is appended onto the exhibit.  With respect to each exhibit, Investigator Anthony Graziano will testify concerning whether any receipts or other documents were either submitted by Defendant BENNETT or obtained by the Government.[2]

Gov't Exhibits 201 through 205 as summary spreadsheets prepared by Investigator Graziano from the voluminous records in the record.

### D. <u>Count One: Travel and Entertainment</u> ($72,407.78 in total)

#### <u>AAA Limousine Service</u> ($165.36)

Defendant BENNETT submitted an expense voucher indicating wherein he wrote that the limousine service was for himself from the airport to LIUNA headquarters and failed to submit a receipt with the voucher (Gov't Exhibit 48, p. 2). However, a receipt recovered from LIUNA's email system demonstrates that the trip was for Aimee Occhetti from the airport to her home.   (Gov't Exhibit 48, p. 3).

---

[2]  Gov't Exhibits 86 through 96c are miscellaneous exhibits.

**Las Vegas Trip (April 18-21, 2014) ($13,099.77)**

Defendant BENNETT submitted all the expenses for this trip--including airfare, hotels, restaurants, lounges, and car services totaling more than $13,000--indicating he attended an event for the "CBCI" or Congressional Black Caucus Institute.  (Gov't Exhibit 49, pp. 9-10, 13-14, 18, 20-21, 23, 25-33).  The CBCI, however, is a modest think tank in Washington, D.C. with but a few small educational events each year and had no events that would involve repeated $500 dinners and $1,000 hotel stays.   The schedule of CBCI events for 2013 through 2016 did not include any events in Las Vegas, NV.   (Gov't Exhibits 50, 55).

The Government will call two CBCI Board members, Ms. Vanessa-Griddine-Jones and Mr. Art Collins, who will testify that the organization has no record of any connection with Defendant BENNETT.   Mr. Collins will also testify that he was unaware who Defendant BENNETT was prior to the Indictment despite BENNETT using Mr. Collins' name over thirty (30) times to justify lavish dinners and hotel stays.  (Gov't Exhibit 55, pp. 1, 4, 5, 8, 10, 12, 25, 30, 32, 34, 36, 40, 42, 44, 56, 62, 64, 66, 73, 77, 82, 95, 101, 107, 109, 115, 125, 126, 127, 129).[3]

---

[3]   As set forth further below, Defendant BENNETT attempted to disguise more than $52,000 of his personal travel and entertainment under Count One, both in and out of Washington D.C., by claiming them as events of the Congressional Black Caucus Institute, or "CBCI."  See Gov't Exhibit 203 (Schedule of Purchases with CBCI as the Business Purpose).

Finally, the Government will produce Girlfriend Number One who was Defendant BENNETT's girlfriend at the time, who will testify that she accompanied BENNETT on the trip to Las Vegas on April 18-21, 2014, and that he paid for all expenses using a credit card.   Girlfriend Number One will also produce text messages sent by Defendant BENNETT to her offering to take her to Las Vegas on these dates as a birthday present.   (Gov't Exhibit 87, p. 17).

### New York Trip (May 13-18, 2014) ($12,918.19)

Defendant BENNETT also submitted all the expenses for a trip with the same girlfriend to New York City, NY claiming in his expense vouchers that it was a "CBCI 21st Century meeting."   (Gov't Exhibit 51, pp. 3-35).   The CBCI, however, had no "21st Century meeting" in New York on those dates and had no meetings in New York City from 2013 through 2016 (Gov't Exhibit 50).

Defendant BENNETT's former girlfriend will testify that she accompanied BENNETT to New York City on those dates and that he paid for all of the trip expenses, which totaled nearly $13,000 at LIUNA's expense.   Girlfriend Number One will also provide details of the trip including specifics about hotels, restaurants, and a $3,400 purse Defendant BENNETT purchased for her at Louis Vuitton.   (Gov't Exhibit 51).

### Orlando Trip (February 20-24, 2016) ($1,177.81)

Defendant BENNETT submitted expense vouchers for a trip to Orlando, FL

also claiming that the trip was for a "CBCI 21st Century Board Meeting." (Gov't Exhibit 52, p. 3). However, the CBCI had no "21st Century meeting" in Orlando on those dates and had no meetings in Orlando from 2013 through 2016 (Gov't Exhibit 50). Close examination of the receipts submitted by Defendant BENNETT reveal that his wife and minor daughter accompanied him on the trip. (Gov't Exhibit 52, p. 10).

### Orlando Trip (March 17-19, 2016) ($1,711.24)

Defendant BENNETT also falsely justified hotel and restaurant expenses for another trip to Orlando, just one month later than his previous trip to Orlando, as a "CBCI 21st Century Board Retreat." (Gov't Exhibit 52, p. 3). Examination of the receipt he submitted for this trip reveal the real purpose of the trip was for a vacation to Walt Disney World. (Gov't Exhibit 52, p. 4-6).

### Boat Slip Fees ($9,973.13)

Defendant BENNETT owned a boat which he and his wife stored in a slip at Prince William Marina. (Gov't Exhibit 54). Defendant BENNETT made three charges at Prince William Marina totaling more than $9,800 using his LIUNA-issued AMEX card. The ledgers and emails obtained from Prince William Marina match the exact dollar figures charged on the card by Defendant BENNETT. The sole expense voucher Defendant BENNETT produced to LIUNA in support of a $5,167.31 purchase for slip rental fees was for a "board dinner" for "the Congressional Black Caucus 21st Century—Cmte" (Gov't Exhibit 54). Defendant BENNETT failed to

produce any supporting receipts for these expenditures and the CBCI has no record of such an event.

### Washington, D.C. Metro Area Restaurants and Hotels ($33,462.08)

During his tenure as Chief-of-Staff, Defendant BENNETT used his LIUNA-issued AMEX card to make hundreds of food, liquor, and hotel purchases in Washington, D.C., totaling tens of thousands of dollars.  (Gov't Exhibit 203).  The great majority of those purchases were not charged in Count One because Defendant BENNETT submitted some business reason for the expense and/or there was not sufficient evidence at the time to demonstrate that the business purpose he submitted was false.

Nonetheless, Count One does charge dozens of restaurant and hotel expenditures made by Defendant BENNETT using his LIUNA-issued AMEX card as thefts totaling more than $33,000, based upon the following evidence:

### 1. Restaurant and Hotel Expenses from March 20 to May 10, 2014

Count One charges these expenses because, rather than the business reasons provided by Defendant BENNETT, Girlfriend Number One, in fact, accompanied him on those occasions.  Girlfriend Number One will also testify in detail concerning restaurant meals and hotel stays purchased by Defendant BENNETT using his LIUNA-issued AMEX card during their seven-week relationship.  Girlfriend Number One will also provide text messages confirming some of their stays at hotels and meals

19

at restaurants in Washington D.C.   (Gov't Exhibits 87, 88).

## 2. Use of CBCI Events and Entertaining

Defendant BENNETT used the false justification of attending CBCI events or entertaining CBCI officials to justify all but one of the remaining hotel and restaurant purchases in Count One.   As noted above, the CBCI is a small, educational organization that does not engage in lavish events and entertaining and has no record of Defendant BENNETT's involvement in any of its activities.   In addition, a CBCI Board member frequently named by Defendant BENNETT as attending dinners with him will testify that he does not recall ever meeting BENNETT.   (Gov't Exhibits 50, 55).

## 3. Quantum Reefs

Defendant BENNETT submitted an expense voucher for a purchase at Quantum Reefs, with no accompanying receipt, wherein he claimed that the expense was for a lunch meeting with the representative for the Southern Region of the Democratic National Committee.   The receipt for this expenditure obtained by the Government from Quantum Reefs shows that it is an aquarium supply company and that Defendant BENNETT's purchase was, in fact, for aquarium supplies.   (Gov't Exhibit 94).

### E. **Count Two: Household Goods and Services** **($35,823.22 in total)**

### **Amazon** **($3,749.12)**

Defendant BENNETT made more than thirty (30) purchases of various items over the internet using Amazon.com.   Some of the items were potentially for LIUNA and/or were delivered to LIUNA Headquarters.   For example, Defendant BENNETT purchased an office safe which was delivered to his office and was found there when he was terminated.   That purchase is **not** included in the Count Two.   (Gov't Exhibit 56b, purchase #2).

In contrast, Count Two charges that Defendant BENNETT purchased 23 items from Amazon.com which had no legitimate business purpose for LIUNA and for which he provided no receipts to LIUNA.   (Gov't Exhibit 56a).   In addition, records obtained by Amazon.com demonstrate that the items purchased by Defendant BENNETT included shoes, an Apple watch, a hose pot, garden equipment and sculptures, hiking equipment, pepper spray, ladders, power tools, and cufflinks. Amazon.com records also demonstrate that each of these items, moreover, were delivered to Defendant BENNETT's home in Alexandria, Virginia.   (Gov't Exhibit 56b).

Notably, Defendant BENNETT attempted to justify some of these purchases by writing "FRAUD" on the expense voucher he submitted.   (Gov't Exhibit 56a). Additional expense vouchers for other purchases submitted by Defendant BENNETT

bear the same "fraud" or "disputed" claim and witnesses from LIUNA will testify that BENNETT frequently claimed that questionable purchases on his LIUNA AMEX statement were the result of fraud or stolen credit cards.

Records obtained from AMEX, however, demonstrate that Defendant BENNETT made only three claims of fraud with AMEX and that he falsely claimed that he filed fraud claims with AMEX over twenty times to justify personal purchases to the LIUNA Accounting Department.   (Gov't Exhibit 86, 205).[4]

### Armstrong Management ($731.95)

Defendant BENNETT submitted an expense voucher, but no receipt, to LIUNA falsely indicating that the charge was for "storage facility for office items", but bill obtained from Armstrong Management shows that the charge $731.95 was, in fact, an assessment from BENNETT's home owner association.   (Gov't Exhibit 57).

### Best Buy ($1,648.22)

Defendant BENNETT made numerous purchases at Best Buy, both in store and over the internet, many of which could potentially be used by LIUNA for a legitimate business purpose.   In four instances, however, Defendant BENNETT falsely claimed to purchase something for the office, without submitting a receipt, when the receipts

---

[4]   Defendant BENNETT had several different LIUNA-issued AMEX cards during his employment for which he falsely claimed that questionable purchases were the result of "fraud."   A spreadsheet containing all the LIUNA-issued AMEX cards he used during the relevant period may be found at Gov't Exhibit 204.

obtained from Best Buy demonstrate that he purchased something else entirely.

Accordingly, Count Two of the Indictment charges four purchases Defendant BENNETT made at Best Buy with his LIUNA-issued AMEX card:

1. Defendant BENNETT submitted an expense voucher, but no receipt, for a purchase on July 2, 2015, for an "upgraded external hard drive" for $264.99.   (Gov't Exhibit 58a, p. 5).   The receipt obtained by the Government from Best Buy establishes he purchased a FitBit activity tracking device on that date for $264.99.   (Gov't Exhibit 58b, p.3).

2. Defendant BENNETT submitted an expense voucher, but no receipt, for a purchase on October 1, 2015, for a "router" for the office for $158.99.   (Gov't Exhibit 58a, p. 6).   The record of internet purchases obtained by the Government from Best Buy establishes he purchased a FitBit Charge and accessories on that date for $158.99. (Gov't Exhibit 58c, pp. 23-24, 36, 38-40).

3. Defendant BENNETT submitted an expense voucher, but no receipt, for a purchase on February 10, 2016, for a "hard-drive-portable" for the office for $529.99. (Gov't Exhibit 58a, p. 7).   The record of internet purchases obtained by the Government from Best Buy establishes that he purchased a quadcopter remote aerial drone on that date for $529.99.   (Gov't Exhibit 58c, pp. 1, 4-6, 18, 38-40).

4. Defendant BENNETT submitted an expense voucher, but no receipt, for a purchase on March 16, 2016, for a "TV monitor" for the office for $694.25.   (Gov't

Exhibit 58a, p. 8).   The receipt obtained by the Government from Best Buy establishes he purchased a Nikon digital camera and accessories on that date for $694.25.   (Gov't Exhibit 58b, p. 13)

### Dick's Sporting Goods ($140.50)

Defendant BENNETT submitted an expense voucher, but no receipt, falsely indicating that the purchase was for "coolers for HQ."   Records obtained from Dick's Sporting Goods show that the purchase for $140.50 was, in fact, for t-shirts, athletic wear, and a rain jacket.   (Gov't Exhibit 59).

### Ever After Portraits ($3,358.40)

Defendant BENNETT submitted two expense vouchers, totaling $3,358.40, but no receipts, falsely indicating that the purchases were for "photo/artwork for HQ." Records obtained from Ever After Portraits, however, show that the purchases were, in fact, for a photo shoot and portraits of his wife and minor child.   (Gov't Exhibit 60).

### Extra Space Storage ($3,656.45)

Defendant BENNETT submitted only six expense vouchers covering twelve purchases made at Extra Space Storage for rental of two storage units (#1131 and #1138) totaling $4,475.45.   The expense vouchers indicate that the rental units were for storage of "GP [General President] office items."   (Gov't Exhibit 61a).

However, records obtained by the Government from Extra Space Storage for

Units #1131 and #1138 establish that these units were rented by Defendant BENNETT and his wife for "household furniture clothing, toys" and "furniture, kids toys."  (Gov't Exhibit 61b, pp. 1, 13).

### Frolick Dogs ($819.00)

No rational individual could understand LIUNA's credit card policies as authorizing use of its AMEX card for personal pet expenses.  Nonetheless, the Government will present witnesses to testify that Defendant BENNETT was warned in the Spring of 2016 not to place pet-related expenses on his LIUNA-issued AMEX card.  Even so, on August 6, 2016, Defendant BENNETT made a purchase for $819.00 at Frolick Dogs and failed to submit an expense voucher or receipt for the purchase.  Internet information recovered by the Government confirms that Frolick Dogs is a training and kenneling service for dogs.  (Gov't Exhibit 61b, pp. 1, 13).

### Frager's Hardware ($1,609.83)

On May 27 and 28, 2016, Defendant BENNETT purchased a Big Green Egg smoker and numerous barbeque accessories.  Defendant BENNETT submitted only one expense voucher asserting that the smoker was for LIUNA headquarters and that BENNETT picked up the items using a LIUNA truck.   (Gov't Exhibit 63).

Several aspects of this assertion do not withstand scrutiny.  First, Defendant BENNETT's duties as Chief-of-Staff do not include purchasing equipment for headquarters.  In addition, Defendant BENNETT had previously ordered equipment

or supplies and had them delivered to his office, such as a safe from Amazon.com, or something as small as a pencil cup (Gov't Exhibit 85).   It is broadly implausible that he would need to personally pick up a smoker and other equipment when he could have sent another LIUNA employee or simply had all the items delivered to LIUNA headquarters.

Further, reference to Amazon.com records confirm that Defendant BENNETT's purchase at Frager's Hardware was for his personal use.   On June 1, 2016, just three days after purchasing the Big Green Egg at Frager's Hardware, Defendant BENNETT purchased several accessories on Amazon.com for a Big Green Egg smoker, but not the smoker itself, and had those items delivered to his home and not LIUNA headquarters.   (Gov't Exhibit 56a, pp. 1, 3 (purchase numbers 9-12)).

**Haverty's ($2,481.98)**

On October 5, 2016, Defendant BENNETT purchased a vintage autumn swivel reclining chair from Haverty's over the internet for more than $2,200 and spent an additional $149.00 for "top drawer" delivery of the item to his home, not to LIUNA headquarters.   Defendant BENNETT never submitted anything for this purchase to the LIUNA Accounting Department prior to him being terminated the following Friday, October 14, 2016.   (Gov't Exhibit 64).

It is highly dubious that a Chief-of-Staff would order a swivel recliner for a professional office.   Even if it could be viewed as a legitimate union purchase, it is

26

virtually implausible that Defendant BENNETT would pay for white glove delivery of the chair into his home, only to later personally pull such a bulky item from his home and somehow transport it to LIUNA headquarters.   He could have simply directed Haverty's to deliver the chair to his office if he intended it for business use.

### Hayfield Animal Hospital ($419.50)

As noted above (p. 25), the LIUNA Accounting Department specifically warned Defendant BENNETT to stop using his LIUNA-issued AMEX card for pet expenses. Nonetheless, Defendant BENNETT made two charges on using his LIUNA-issued AMEX card at Hayfield Animal Hospital.   For the purchase made on May 21, 2016, Defendant BENNETT submitted an expense voucher which had no business purpose for the expense.   For the purchase on June 23, 2016, Defendant BENNETT asserted that he was paying with AMEX points, that LIUNA "should receive credit" from AMEX, and that he "will pay until credit received."   Examination of the AMEX statements for the succeeding months indicate no credit was ever given for this purchase (Gov't Exhibits 36-39) and Defendant BENNETT was terminated in October 2016 without paying LIUNA anything for those purchases.   (Gov't Exhibit 42, p. 3).

**Kingstown Lawn and Landscaping ($847.29)**

Defendant BENNETT made several charges at Kingstown Lawn and Landscaping using his LIUNA-issued AMEX card.   On one of the expense vouchers for those charges, Defendant BENNETT wrote "PAY;" thus the expenditure was not charged in Count Two.   (Gov't Exhibit 66, p. 9).   On the expense voucher for the another charge on June 3, 2015, Defendant BENNETT wrote "disputed charge" (Gov't Exhibit 66, p. 5), but records obtained from the Government from AMEX show that Defendant BENNETT never filed a dispute over that charge.   (Gov't Exhibits 86, 205).

For the purchase made on February 1, 2016, for $700.29, Defendant BENNETT wrote "vehicle repair" on the expense voucher he submitted to the Accounting Department.   (Gov't Exhibit 66, p. 6).   However, records obtained by the Government from Kingstown Lawn and Landscaping demonstrate that this vendor is a landscaping company in Alexandria, VA, and that BENNETT had a running account with this company.   Contrary to Defendant BENNETT's assertion, Kingstown Lawn and Landscaping did not perform any vehicle repairs for BENNETT, but did perform, according to records the Government obtained from this company, mulching, pressure washing, spring flower plantings, and weed control at his home located on Dunham Way in Alexandria, VA.   (Gov't Exhibit 66, pp. 8, 10-25).

**NBS Facts ($3,145.59)**

On July 28, 2016, Defendant BENNETT charged more than $3,100 using his LIUNA-issued AMEX card at a private school for tuition for his minor daughter and failed to submit an expense voucher or receipt to the Accounting Department for this expense prior to his termination in October 2016.   (Gov't Exhibit 67).

This expenditure is clearly outside the permitted use of the AMEX card according to LIUNA as Defendant BENNETT well knew.   Even if he retained any improbable intention of repaying LIUNA, he neither acknowledged the personal nature of the expense nor indicated an intention to repay it for his remaining two and a half months with LIUNA.   As noted above (pp. 9-10), the offense under section 501(c) is completed when the victim, in this case LIUNA, was deprived of the use on funds in August 2016.

**Offenbacher's ($2,219.96)**

In early July 2016, Defendant BENNETT purchased an outdoor Big Green Egg cart and numerous barbeque accessories for more than $2,200 from Offenbacher's using his LIUNA-issued AMEX card.   On the various expense vouchers he submitted to LIUNA, he indicated that the items purchased were pre-ordered for LIUNA headquarters, but out-of-stock and that he had "picked up for HQ."   Notably, Defendant BENNETT did not submit any receipts for any of his six purchases at Offenbacher's (Gov't Exhibit 68).   Like the purchase from Frager's Hardware,

Defendant BENNETT claimed on his expense vouchers that the items were not immediately available.  To the contrary, the receipts Defendant BENNETT withheld from LIUNA, but later obtained by the Government, demonstrate that he directed the items from Offenbacher's be delivered to his home.  (Gov't Exhibit 68).

### Old Towne School for Dogs ($1,145.51)

As noted above (p. 25), the LIUNA Accounting Department specifically warned Defendant BENNETT to stop using his LIUNA-issued AMEX card for pet expenses. Nonetheless, Defendant BENNETT made seven charges at the Old Towne School for Dogs using his LIUNA-issued AMEX card without submitting any receipts.  Two of the expense vouchers submitted by Defendant BENNETT indicate "disputed charge" and another indicates that he paid for the item with "AMEX points."  (Gov't Exhibit 69).  However, records obtained from AMEX by the Government demonstrate that Defendant BENNETT did not dispute those charges and that no payments were made on the account with AMEX points.  (Gov't Exhibits 86, 205).  The receipts obtained from Old Towne School for Dogs clearly show Defendant BENNETT's signature on the receipts.  (Gov't Exhibit 69, pp. 11-21.)

### Old Towne Pet Resort ($210.68)

Contrary to LIUNA's policies and warnings he received concerning pet expenses, Defendant BENNETT charged $210.68 using his LIUNA-issued AMEX card at Old Towne Pet Resort and submitted a blank expense voucher without a receipt.

(Gov't Exhibit 70a).   Reference to the internet confirms that Old Towne Pet Resort provides animal kenneling services.   (Gov't Exhibit 70b).

### Smart Tuition ($1,955.10)

On August 16, 2016, Defendant BENNETT charged $1,955.10 for his minor daughter's tuition at a private school using his LIUNA-issued AMEX card and failed to submit an expense voucher or receipt to the Accounting Department for that expense prior to his termination in October 2016.   (Gov't Exhibit 71).

This expenditure is clearly outside the permitted use of the AMEX card according to LIUNA, as Defendant BENNETT well knew.   Even if he retained any improbable intention of repaying LIUNA, he neither acknowledged the personal nature of the expense nor indicated an intention to repay it for his remaining two months with LIUNA.

### Sunset Pet Services ($142.04)

On June 24, 2016, Defendant BENNETT charged $142.04 using his LIUNA-issued AMEX card to have a dog euthanized by Sunset Pet Services.   The expense voucher he submitted with the charge indicates "PayPal" with AMEX points."   (Gov't Exhibit 72a and 72b).   Examination of the AMEX statements for the succeeding months indicate no credit was ever given for this purchase.   (Gov't Exhibits 36-39).

### The Great Republic ($5,942.10)

Defendant BENNETT used his LIUNA-issued AMEX card at The Great

Republic, an antiques dealer, to purchase a knife and a map of the District of Columbia for almost $6,000.   Defendant BENNETT, however, submitted no expense vouchers or receipts to LIUNA for those purchases.   (Gov't Exhibit 73a and 73b).   Emails from Ms. Caroline Bonardi of The Great Republic to government agents indicate that Defendant BENNETT attempted to return the map eleven months after his termination and requested $5,000 in a personal check to himself.   (Gov't Exhibit 73c).

### Town and Country Veterinarian ($1,600.00)

In September 2016, contrary to LIUNA's policies and warnings he received concerning pet expenses, Defendant BENNETT used his LIUNA-issued AMEX card to purchase a labradoodle puppy from Town and Country Veterinarian for $1,600. Defendant BENNETT submitted neither an expense voucher nor a receipt for this purchase.   (Gov't Exhibit 74).

### F. Count Three: Clothing, Jewelry, and Personal Items ($60,224.44 in total)

Defendant BENNETT used his LIUNA-issued AMEX card to make two purchases totaling more than $3,000 at Afram Jewelers, a small jewelry store in Washington, D.C.   Defendant BENNETT submitted one expense voucher for the purchases in which he indicated he made a deposit on "flatware—china" for LIUNA headquarters.   Defendant BENNETT failed to submit any receipts for that purchase. (Gov't Exhibit 75).

Contrary to his representation, receipts obtained by the Government from

Afram Jewelers show that Defendant BENNETT, in fact, purchased a gold cross and chain (Gov't Exhibit 75).   The cross was recovered in BENNETT's office when he was terminated.   See photo at Gov't Exhibit 47, p. 6.   In addition, Girlfriend Number Two, a LIUNA employee with whom BENNETT was romantically involved will testify that she accompanied him to Afram Jewelers on the occasion when he purchased the gold chain and that he bought for her as a personal gift.   Girlfriend Number Two was unaware that Defendant BENNETT purchased the chain using his LIUNA-issued AMEX card.

### Allen Edwards **($3,180.00)**

Defendant BENNETT made four separate purchases of shoes and personal clothing items at Allen Edmonds in the Spring and Fall of 2016 with his LIUNA-issued AMEX card.   On the first purchase, Defendant BENNETT submitted an expense voucher claiming that a LIUNA employee had lost the General President's shoes and that BENNETT had to purchase a replacement pair, but that a "total refund" would be applied to a later statement.   (Gov't Exhibit 76).   Examination of the AMEX statements for the succeeding months indicate no refund was ever given for this purchase (Gov't Exhibits 36-39).

For the purchases on the second occasion, Defendant BENNETT again claimed a credit would be applied to a future AMEX statement, though the succeeding AMEX statements indicate no refund was applied.   On the third occasion, Defendant

BENNETT submitted an expense voucher with no receipt and no explanation for the purchase.  The fourth occasion occurred in the final week before his termination. (Gov't Exhibit 76).

### Crest Cleaners ($1,952.05)

Crest Cleaners is a dry cleaning company approximately one half mile from Defendant BENNETT's home in Alexandria, VA.  From March to October 2016, Defendant BENNETT made more than fifteen (15) different charges at Crest Cleaners, ranging from $55 to $220 using his LIUNA-issued AMEX card.  Defendant BENNETT submitted only eight expense vouchers for those charges, and no receipts whatsoever.   (Gov't Exhibit 77).

On the expense vouchers where Defendant BENNETT indicated an explanation, it only confirmed that the charges at Crest Cleaners are what they appear to be—dry cleaning of personal clothing items.  On one, Defendant BENNETT claimed,--without benefit of a receipt,--that $155.65 charge was for dry cleaning headquarters linens which were "not able to be cleaned by DC cleaners."  (Gov't Exhibit 77, p. 17).  One can only imagine Defendant BENNETT as Chief-of-Staff of LIUNA taking its soiled table cloths or curtains from cleaner to cleaner in Washington only to find one near his house that can do the job for only $155.

In another, Defendant BENNETT claimed—without benefit of a receipt—that Crest Cleaners cleaned his car floor mats, though Crest Cleaners does not offer such

services.   In another, Defendant BENNETT stated that he asked Crest Cleaners to reverse the charges (Gov't Exhibits 77, p. 24), but examination of the AMEX bills for the succeeding months indicate no refund was ever given for this purchase.   (Gov't Exhibits 36-39).

### Neiman Marcus ($358.31)

Defendant BENNETT claimed that a lunch for $358.31 at "Café Aventus" at Neiman Marcus in Chicago, IL was a business lunch without submitting any receipt. Records obtained by the Government from Neiman Marcus reveal that Defendant BENNETT purchased a cologne named Aventus from Neiman Marcus on the date in question for the same amount.   (Gov't Exhibit 78).

### Nordstrom ($7,435.37)

Defendant BENNETT made three purchases of tailored clothing at Nordstrom in June and September 2016 totaling more than $7,400.   (Gov't Exhibit 78).   For the June purchase, Defendant BENNETT submitted an expense voucher, but no receipt, claiming that he would receive a "credit" for the purchase and that he had used "AMEX points" to make the purchase.   (Gov't Exhibit 79, p. 4).   Succeeding AMEX statements show no credit or AMEX points was applied for that purchase.   (Gov't Exhibits 36-39).

Defendant BENNETT submitted neither expense vouchers nor receipts for his purchases in September 2016.   Records obtained by the Government from Nordstrom

confirm that Defendant BENNETT purchased sport coats and suits on those occasions.   (Gov't Exhibit 79, pp. 7-11).

### Old Town Shoe ($1,747.05)

Defendant BENNETT used his LIUNA-issued AMEX card at Old Town Shoe and Luggage on six occasions.   On one occasion, Defendant BENNETT claimed he purchased a "locking mobile file cabinet" at that store, though the investigation revealed the establishment to be a small shoe repair business that does not sell such items. (Gov't Exhibit 80, pp. 8-12).

On later occasions, Defendant BENNETT claimed that Old Town Shoe repaired a "ripped leather LIUNA board room desk placement" and an "arm rest to an office leather chair."   (Gov't Exhibit 80, pp. 5-7).   Records obtained from Old Town Shoe and Luggage indicate that it does not perform such repairs and it is nonetheless implausible that the Chief-of-Staff would personally transport furniture from LIUNA and back to a store.   (Gov't Exhibit 80, pp. 8-12).

### OROGold Cosmetics ($11,550.42)

On September 15, 2016, Defendant BENNETT used his LIUNA-issued AMEX card to purchase more than $11,000 in gold-flecked cosmetics at OROGold Cosmetics located within the Caesar's Palace Hotel, Las Vegas, NV.   (Gov't Exhibit 81). Defendant BENNETT later presented those items as a gift to Girlfriend Number Two with whom he was romantically involved.   Girlfriend Number Two, who never used

the cosmetics, later returned them to LIUNA officials the following month after she learned that Defendant BENNETT was terminated for, among other reasons, using his LIUNA-issued AMEX card for personal purchases.    See photos at Gov't Exhibit 47, pp. 13-47).

### Pentagon City Mall ($1,557.32)

On June 10, 2016, Defendant BENNETT made two charges totaling more than $1,500 at Pentagon City Mall.  He later submitted expense vouchers indicating that both charges were the result of "fraud" which he would dispute with AMEX.  (Gov't Exhibit 82).  Records obtained from the Government from AMEX show that Defendant BENNETT never filed a dispute over those charges (Gov't Exhibits 86, 205).  Defendant BENNETT's AMEX statement for this month also reveals he was shopping for clothes at another local area mall on that same day.  (Gov't Exhibit 79, p. 4).

### Shinola ($1,083.95)

On June 28, 2016, Defendant BENNETT purchased a Shinola watch at a Shinola dealer located in Washington, D.C.  Defendant BENNETT submitted an expense voucher for this purchase, but no receipt, claiming the purchase was for "LIUNA 25th Convention Gift (purchased model design)."  (Gov't Exhibit 83).  Receipts obtained by the Government indicate that the purchase was for an ordinary Shinola watch, not a "model design" for the convention in September 2016.  The

37

watch was later recovered from the safe in Defendant BENNETT's office upon his termination in October 2016.   (Gov't Exhibit 47, pp. 4-5).

**Sissy's Log Cabin ($29,839.85)**

Defendant BENNETT used his LIUNA-issued credit card to make more than $33,000 in purchases on a personal account he maintained at Sissy's Log Cabin, a jewelry store located in Jonesboro, Arkansas, within an hour and a half of his hometown in Camden, Arkansas.   For two purchases totaling $2,479.00 in December 2015, Defendant BENNETT wrote on the credit card statement that he purchased "china purchased for HQ—returned."   (Gov't Exhibit 84, p. 1).   Sissy's Log Cabin does not sell chinaware and there is no indication on subsequent AMEX statements that BENNETT executed any returns.   (Gov't Exhibit 84, p. 1).   Defendant BENNETT submitted blank expense vouchers for the eleven remaining charges on his account, on one claiming that he purchased "flatware/china serviceware" for the LIUNA "HQ Bldg" and another stating "HQ/Bldg.—Final Charge for Ninth Floor Flatware." (Gov't Exhibit 84, p. 10, 15).

On the contrary, records obtained from Sissy's Log Cabin indicate that none of those purchases were for flatware or chinaware, but instead for various pieces of personal jewelry including a diamond ring, a diamond-encrusted cross, gold chains and earrings, and a Rolex watch.   (Gov't Exhibit 84, p. 26, 27, 68 (Rolex and cross), p. 28 (stud earrings) p. 29 (diamond ring), p. 31-35 (receipts and invoices)).   The Rolex

watch, diamond-encrusted cross, and gold chains were recovered in Defendant BENNETT's office upon his termination.   (Gov't Exhibit 47, pp. 1-3, 6).

The final two charges made by Defendant BENNETT on his Sissy's Log Cabin account belie any contention that he did not wish to use his AMEX card to steal from LIUNA and, instead, intended to square all of his debts on the card.   On October 13, 2016, LIUNA informed Defendant BENNETT that he was terminated due to placing Aimee Occhetti on LIUNA's healthcare plan and for unauthorized purchases on his LIUNA-issued AMEX card.   The next morning, however, Defendant BENNETT used that AMEX card to make two payments of $2,500 each on his outstanding account balance at Sissy's Log Cabin.   (Gov't Exhibit 84, pp. 67-68).

Respectfully submitted,

David Jaffe, Chief
Organized Crime and Gang Section
Criminal Division

By:   /s/Vincent J. Falvo
VINCENT J. FALVO, JR.
JULIE A. FINOCCHIARO
Department of Justice
1301 New York Avenue, NW
Room 711
Washington, D.C. 20530
(202) 353-9384
Dated November 30, 2018   vincent.falvo@usdoj.gov

## CERTIFICATION OF SERVICE

I hereby certify that on November 30, 2018, I electronically filed the foregoing

trial memorandum with the Clerk of the Court using the ECF system which will send

notification of such filing to the following:

> Glenn F. Ivey, Esq.
> Price Benowitz
> 409 7th Street, Suite 100
> Washington, DC 20004

> _____/s/_____
> Vincent J. Falvo, Jr.
> VINCENT J. FALVO, JR.
> Trial Attorney
> Criminal Division
> U.S. Department of Justice
> 1301 New York Avenue, N.W.
> Room 711
> Washington, D.C.   20530
> (202) 353-9384
> vincent.falvo@usdoj.gov